# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ROSEMARIE SAILE,

                           Plaintiff,

      v.

                                         5:13-CV-1394

NEW YORK STATE DEP'T OF              (ATB)
MOTOR VEHICLES,

                          Defendant.

---

JAMES A. MEGGESTO, ESQ., for Plaintiff
KEVIN M. HAYDEN, Asst. Attorney General for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and N.D.N.Y. Local Rule 73.1, this matter was referred to me, with the consent of the parties, for all proceedings and entry of a final judgment, by the Honorable Mae A. D'Agostino, United States District Judge on August 25, 2015. (Dkt. No. 34).

Plaintiff brings this civil rights action, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. and pursuant to the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296. (Complaint ("Compl.")) (Dkt. No. 1). Plaintiff alleges that she was subjected to a hostile work environment and to retaliation for her complaints of discrimination.

Presently before the court is defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 33). Plaintiff has responded in opposition to the motion, and defendant has filed a reply. (Dkt. Nos. 37, 38).

## I.    Facts

Plaintiff began working at the Department of Motor Vehicles ("DMV") in July of 2008 as a Motor Vehicle Representative ("MVR"). (Compl. ¶ 10; Pl.'s Dep. at 11 (Dkt. No. 33-2)).  Plaintiff worked in the Western Lights[1] Office ("Western Lights") until she received a transfer to the North Syracuse Office ("North Syracuse") in January 2013, which she requested in October of 2012.[2]  (Pl.'s Dep. at 15).  All of the claims in this complaint deal with incidents which allegedly occurred while plaintiff was working at Western Lights. (Def.'s & Pl.'s SMF ¶ 3; Pl.'s Dep. at 17).  Plaintiff claims that she has been subjected to an "unwanted barrage of sexually-charged language on a regular basis and subjected to unwanted nudity on a regular basis." (Compl. ¶ 18).

During her deposition, plaintiff began by stating that co-workers Joshua Lance and Brian Powers would make "sexual innuendos" and other comments about customers of the DMV on a "daily basis." (Pl's Dep. at 17-18).  Plaintiff claimed that these individuals would come to her work station to make those comments. (Pl.'s Dep.

---

[1] This office has also been referred to as the "Syracuse Office," but to distinguish it from the North Syracuse Office, the court will refer to it as "Western Lights."

[2] The court notes that defendant's statement of material facts indicates that plaintiff requested a transfer in October of 2012 and received that transfer in January of 2013. (Def.'s Statement of Material Facts ("SMF") ¶ 2).  Plaintiff's statement of material facts admits that she requested a transfer in October of 2012, but states that "it was not granted." (Pl.'s SMF ¶ 2).  Instead, plaintiff's SMF states that she "submitted a reasonable accommodation request on 1/4/13," which resulted in the transfer. (*Id.*)  During plaintiff's deposition, she stated that she initially made a verbal request to Ms. Adair, who asked plaintiff to put the request in writing. (PL.'s Dep. at 77).  Plaintiff put the request in writing "just on a piece of paper," but then she obtained a form. (*Id.*)  Then she asked her doctor for a note to request her "immediate" transfer, and then she filed a "reasonable accommodation to have [her] transfer taken." (*Id.*)  The transfer was completed "in January." (*Id.*)  It is unclear whether plaintiff's transfer was actually "denied" as plaintiff's SMF states, or whether the transfer took more time than expected. This slight difference in the Statements of Material Fact does not affect this court's decision.

at 17). This alleged conduct involved making comments about a female customer's "ass," whether they thought she was "pretty" or "cute," or had "sizable boobs," commenting on a customer's "rack," making "passes" at customers and trying to get their telephone numbers, making "derogatory" comments about individuals who were "too ugly" or "too pretty," and making comments about gay men. (Pl.'s Dep. at 19-20, 25, 45). On March 14, 2012, Mr. Lance told plaintiff, in the presence of several other co-workers, that he thought a customer was "hot."[3] (Pl.'s Dep. at 55).

Lance and Powers would speak to "each other," but would try to include as many of the employees as possible in their conversations. (Pl.'s Dep. at 24-25). The inappropriate comments were "usually whispered," so that the employees could hear, but plaintiff testified that sometimes the comments were made directly to customers. (Pl.'s Dep. at 25). Plaintiff testified that on a "few" occasions, their comments were directed to her, but "mostly" the two men discussed customers. (Pl.'s Dep. at 19). On those occasions when they were talking about plaintiff, they would make comments about her "upper physique." (Pl.'s Dep. at 20). Plaintiff's response was usually to "just walk away." (*Id.*)

Plaintiff testified that prior to 2010, Lance and Powers made "some" comments, but not on a "regular basis." (Pl.'s Dep. at 19). Plaintiff states that the situation became worse after 2010. (Pl.'s Dep. at 24). She attributed this to a management change in 2011, when Kristen Lester-Hernandez became the Director; Greg Mueller became

---

[3] Plaintiff did not think that the customer heard the comment, and plaintiff was not aware that any customers ever made complaints about Mr. Powers's or Mr. Lance's behavior. (Pl.'s Dep. at 55-56).

Manager; and Tywanna Adair became a "Supervisor 2." (*Id.*) Plaintiff stated that after the change in management, her immediate supervisor became Shelly Greene. (Pl.s Dep. at 27). Plaintiff testified that she complained about Lance and Powers verbally to Ms. Greene on "several occasions," "at least every other month," but plaintiff could not remember exactly when those complaints were made. (Pl.'s Dep. at 27). Plaintiff stated that she began to keep "handwritten notes" in 2012, but plaintiff kept only one copy of a formal complaint that she filed after the management change. (Pl.'s Dep. at 23, 28). She could not remember the content of the complaint because she testified that there were "other things" in the complaint "besides Brian and Josh." (*Id.*) Plaintiff testified that Mr. Harry Delmarter[4] was also making "sexually-charged" comments, and that plaintiff verbally complained to Ms Adair about all three individuals in 2011. (Pl.'s Dep. at 30). Only those three individuals were ever involved in any improper conduct. (Pl.'s Dep. at 31). When asked whether she ever laughed at the comments, plaintiff stated that she may have "smirked." (Pl.'s Dep. at 44).

Plaintiff testified that she was exposed to "unwanted nudity," on a "regular basis" by Mr. Powers. (Pl.'s Dep. at 31). Plaintiff stated that the "worst" incident occurred in November of 2011 when Mr. Powers was bowling with co-workers at a holiday function, and someone took a picture of him from behind, bowling with his pants down, exposing his buttocks. (Pl.'s Dep. at 23, 31-32 & Ex. B).[5] Plaintiff was not present at

---

[4] Mr. Delmarter was a supervisor. (Delmarter Dep. at 6) (Dkt. No. 37-6).

[5] Exhibit B is a copy of the photograph that was sent to plaintiff as a text message. Plaintiff had the photograph printed. (Pl.'s Dep. at 34).

the function, but the photograph was sent by text message to every employee. (Pl.'s Dep. at 31-32). She knew that the photograph went to all the employees because it became the subject of conversation at work. (Pl.'s Dep. at 36).

Plaintiff later discovered that Mr. Delmarter took the photograph, but the text was sent by co-worker Tony Kurowski. (Pl.'s Dep. at 32). Plaintiff stated that she gave Tony her telephone number, and that, prior to this incident, she had received other text messages from him, both personal and professional. (Pl.'s Dep. at 33). Plaintiff stated that she worked with Mr. Kurowski from 2008 until 2013, but did not consider him a "friend." (Pl.'s Dep. at 32). She told Mr. Kurowski that she found the incident "appalling" and "disgusting," and she told him never to send her anything like that again. (Pl.'s Dep. at 35). Mr. Kurowski apologized and told plaintiff he would not do that again. (*Id.*)

Plaintiff testified that there were also "a couple" of times that Mr. Powers "took off his shirt," once in the storage area and once in Ms. Adair's office. (Pl.'s Dep. at 39-43). Plaintiff testified that in May of 2012, she went outside to smoke a cigarette. (Pl.'s Dep. at 41-42). When she walked outside the building, she looked briefly through an open door to the stockroom, and saw Mr. Powers moving boxes with his shirt off and bare-chested. (*Id.*) Mr. Lance was with him, and he had taken his dress shirt off, but was still wearing a t-shirt. Plaintiff took a picture of Mr. Powers with her cellular telephone, but stated that she could not remember asking his permission to do so. (*Id.* & Ex. C).[6] Plaintiff claimed that the incident in Ms. Adair's office involved Mr. Powers

---

[6] Exhibit C is a copy of the stockroom photograph, taken by plaintiff.

sticking his chest in Ms. Adair's face, but plaintiff could not remember when this may have happened or any other details of the incident. (Pl.'s Dep. at 40).

Plaintiff testified that she was sure that she complained about Mr. Powers's and Mr. Lance's comments to her supervisors, Shelley Greene or Laurie Sheridan, but could not recall any specific dates for those complaints. (Pl.'s Dep. at 45-46). Plaintiff also stated that she would always let Mr. Powers and Mr. Lance know that she was uncomfortable with their comments. (Pl.'s Dep. at 46). Plaintiff testified that Ms. Adair and Mr. Delmarter discussed the bowling photograph "on two occasions," during which plaintiff was present. (*Id.*) The first time was shortly after the photograph was circulated to the staff, and the second time, Ms. Adair called plaintiff into her office to have a discussion about the photograph and about the "problems" in general. (Pl.'s Dep. at 46-47). Plaintiff claims that during the second conversation, Ms. Adair and Mr. Delmarter were laughing and showing each other the photograph. (Pl.'s Dep. at 47). Mr. Powers was present at the second meeting. (*Id.*)

Plaintiff testified that the meeting with Ms. Adair took a little less than one hour, and the "work atmosphere" was discussed, because "things were quite hostile at that point." (Pl.'s Dep. at 48). Plaintiff stated that Ms. Adair told "all of us" to go in to try to "mediate the situation." (Pl.'s Br. at 48). Plaintiff also alleges that her work situation worsened after she complained about the photograph, and that she was the victim of retaliation for her complaints about Mr. Powers's and Mr. Lance's behavior. (Compl. ¶ 68). When asked who was making the environment "hostile," plaintiff testified that it was Mr. Delmarter because he was telling everyone that plaintiff filed a complaint of

sexual harassment with "Labor Relations." (*Id.*)

Plaintiff also claimed that Mr. Delmarter was telling her co-workers "stories" to make sure that they did not associate with plaintiff, and this made her work environment "difficult."[7] (Pl.'s Dep. at 49). In the complaint, plaintiff states that Mr. Delmarter also told the staff to "watch out for" plaintiff because she was trying to press sexual harassment charges against them. (Compl. ¶ 68). Plaintiff claims that Mr. Delmarter refused to speak with her, and both Mr. Lance and Mr. Powers were "standoffish" with her. (Compl. ¶ 69).

When asked about Mr. Delmarter's "stories," plaintiff stated that he was making "personal accusations" against her. (Pl.'s Dep. at 51). Mr. Delmarter knew plaintiff since high school, and apparently he was sharing information with co-workers about an embarrassing event that happened when plaintiff was younger.[8] (Pl.'s Dep. at 52). Plaintiff stated that her working conditions became "very difficult . . . after that," but plaintiff did not know specifically with whom Mr. Delmarter shared this information. (*Id.*) Plaintiff states that Mr. Delmarter "whispered" this information to plaintiff "in the wedge,"[9] but she did not think that anyone else overheard the specific conversation. (Pl.'s Dep. at 53).

---

[7] In her complaint, plaintiff alleges that Mr. Delmarter did not sexually harass plaintiff, but he was a part of the "retaliation that followed her reporting the bowling photograph incident. (Compl. ¶ 66).

[8] Plaintiff stated that the incident was "embarrassing," but not sexual in nature. (Pl.'s Dep. at 53).

[9] The "wedge" is apparently part of the DMV office.

In her complaint, plaintiff stated that Mr. Lance brought his dog into the office on September 11, 2012, and Ms. Adair told him to "'get that dog out of here, we already have enough bitches.'" (Compl. ¶ 50, Pl.'s Dep. at 56). During plaintiff's deposition, she testified that she assumed that Ms. Adair was referring to her when she made that statement because she looked at plaintiff when she said it. (Pl.'s Dep. 56-57).

At plaintiff's deposition, she testified that she was aware that a "Code of Conduct" was distributed to all the staff on February 14, 2012, but that she was not aware of such a Code prior to that date. (Pl.'s Dep. at 58). It was plaintiff's understanding that this document contained directions prohibiting inappropriate language and discussing appropriate attire, but she could not remember what else was written in the code. (Pl.'s Dep. at 59). Plaintiff alleged that, notwithstanding the distribution of the Code, Ms. Adair and Mr. Delmarter told her that the "perpetrators" were not expected to change "overnight." (Pl.'s Dep. at 59-60).

Plaintiff testified that her work environment interfered with her well-being. (Pl.'s Dep. at 60). Plaintiff stated that for a four-month period, her anxiety level was so "huge," that she vomited every time that she pulled into the parking lot.[10] (*Id.*) Plaintiff claimed that the four month period started in January of 2013 and did not stop until April. (Pl.'s Dep. at 61). However, plaintiff conceded that she never received any negative evaluations while she worked at the DMV, and that the perception of her work

---

[10] Earlier in the deposition, plaintiff testified that she had panic attacks, nausea, vomiting, and a racing heart. (Pl.'s Dep. at 7). She was prescribed Zoloft and Xanax at the time, but she stopped taking all medications for anxiety in April of 2014. (Pl.'s Dep. at 7). Plaintiff testified that Nurse Practitioner, Jolene Cook diagnosed plaintiff with Anxiety. (Pl.'s Dep. at 6, 65).

was "stellar." (Pl.'s Dep. at 61-62). Plaintiff testified that she had a loss of pay because she had to leave work for a lengthy amount of time due to "illness," and she lost a lot of overtime wages that she could have earned. (Pl.'s Dep. at 63). Plaintiff testified that she had more commuting time when she "had to" transfer to the North Syracuse office, so she spent more money on gas and had more milage on her car. (Pl.'s Dep. at 63-64).

Plaintiff also claimed that, in addition to being out of work due to illness, she had to take time off and use her vacation time to pursue the litigation. (Pl.'s Dep. at 65-66). Plaintiff filed her complaint with the New York State Division of Human Rights ("NYSDHR") On October 12, 2012.[11] (Pl.'s Dep. at 70). Plaintiff stated that she never told any of her colleagues or supervisors that she was filing, or that she had filed, the complaint. (Pl.'s Dep. at 70). Plaintiff stated that the majority of her anxiety occurred after she filed the complaint with NYSDHR. (Pl.'s Dep. at 71). She said that once she filed the complaint, "the retaliation was immense." (*Id.*) Prior to the NYSDHR complaint, the retaliation consisted of Mr. Delmarter creating a "hostile work environment"[12] by telling stories about plaintiff's youth. (Pl.'s Dep. at 72). However, after plaintiff filed the NYSDHR complaint, she stated that the retaliation was "very subtle." (Pl.'s Dep. at 73). Plaintiff testified that "they" would make sure that she was assigned to a work station next to an individual who was a difficult person, and co-

---

[11] The NYSDHR decision in plaintiff's case has been attached as an exhibit to the complaint. (Dkt. No. 1-1). Essentially, the NYSDHR found probable cause to support the allegations in the complaint. (Dkt. No. 1-1 at 6).

[12] Plaintiff uses the term "hostile work environment" to describe actual "hostility," representing angry or unpleasant situations in addition to what the court defines as a hostile work environment based on her gender.

workers would tell plaintiff to "watch [her] back."[13] (*Id.*) Plaintiff testified that there was one person in particular who had difficulty getting along with everyone, and plaintiff would be assigned to sit next to her on a more regular basis than prior to her complaints.[14] (Pl.'s Dep. at 74). Plaintiff also testified that her "mail" duties were taken away from her after she complained. (*Id.*)

Plaintiff testified that she transferred from Western Lights to North Syracuse in January of 2013, but that she was not miss work due to the defendant's "conduct" until the end of 2013.[15] (Pl.'s Dep. at 66). Plaintiff claimed that she was "unable to function" because she never knew what was going to happen each day, and she was on "pins and needles," making sure that she did not speak with anyone "because things were twisted to their purposes." (Pl.'s Dep. at 67).

Plaintiff testified that in April of 2014, while she was working at the North Syracuse office of the DMV, she was subject to a notice of discipline and counseling for using foul language. (Pl.'s Dep. at 8-10). Plaintiff testified that she was represented by counsel "during interrogation," and that plaintiff settled the case with a loss of "five days of accruals." (Pl.'s Dep. at 9). Plaintiff willingly stopped working at the DMV in

---

[13] Plaintiff stated that AnnMarie Clarke, Laurie Sheridan, Sally Williams, Tony Kurowski, and Julie Bland all told plaintiff to watch her back, and that plaintiff understood this to mean that her "superiors were being retaliatory." (Pl.'s Dep. at 76).

[14] Plaintiff testified that this individual was prone to outbursts, would "yell at" customers and "yell at" co-workers. (Pl.'s Dep. at 75). Plaintiff also testified that she never liked sitting next to Mr. Kurowski, but she was assigned to sit next to him after her complaint. (*Id.*)

[15] At the time of her deposition in 2014, plaintiff was no longer working for the DMV, but was still working for the Office for Persons with Developmental Disabilities ("OPWDD"), also a New York State agency. (Pl.'s Dep. at 70).

April of 2014 when she began working for OPWDD, a position that she currently holds. (Pl.'s SMF ¶ 29).

Plaintiff's response to the defendant's motion for summary judgment contains the deposition transcript of AnnMarie Clarke, a former secretary at the DMV and a friend of plaintiff's.[16] (Clarke Dep. at 6, 17) (Pl.'s Ex. A) (Dkt. No. 37-3). Plaintiff's Ex. E is a letter, written by Ms. Clarke at the request of Ms. Grace Pell, a Senior Personnel Administrator for the DMV in Albany. (Dkt. No. 37-7). The letter was an exhibit at Ms. Clarke's deposition. (Clarke Dep. at 2, Ex. 2). The letter details Ms. Clarke's observations of the allegedly inappropriate behavior exhibited by Mr. Powers and Mr. Lance when she worked at the DMV.

In her letter, and during her deposition, Ms. Clarke also discussed the "repercussions" that staff would suffer when they complained about inappropriate behavior. (*Id.* at 1-3; Clarke Dep. at 13-14). In addition to being required to sit next to a person who was difficult, Ms. Clarke testified that if a person was considered a "trouble maker," and that person asked for time off, a more senior person would "suddenly" ask for the same time off, so that the "trouble maker" would be denied the vacation time. (Clarke Dep. at 14). Ms. Clarke was not working at the DMV at the time of the bowling photograph, because she took some time away from the DMV to work at another agency, but saw the photo when she returned to work at the DMV in March of 2012. (Clarke Dep. at 14-16).

---

[16] At the time of her deposition, Ms. Clarke worked as a secretary for the State University of New York ("SUNY") College of Environmental Science and Forestry ("ESF").

Plaintiff testified that she discussed her federal lawsuit briefly with Ms. Clarke because Ms. Clarke told plaintiff that defense counsel had contacted Ms. Clarke. (Pl.'s Dep. at 38). Plaintiff then stated that she did not inform Ms. Clarke specifically about the nature of the allegations, but stated that "[t]his actually got blown out of proportion. This isn't what I was planning." (Pl.'s Dep. at 39). Plaintiff stated that "[i]nitially my complaints were just to make it stop and make my work environment better." (*Id.*)

Plaintiff's response to defendant's motion for summary judgment also contains the deposition transcripts of Brian Powers;[17] Tywanna Adair;[18] and Harry Delmarter.[19] Mr. Powers testified that he was employed by the DMV as am MVR.[20] (Powers Dep. at 5). Mr. Powers testified that there were two levels of supervisors above him in rank – Supervisor I and Supervisor II –, and above the two supervisory levels, was the office manager, Ms. Adair. (Powers Dep. at 6-7). Mr. Powers testified that the MVRs were assigned to particular stations, but the stations would change from day to day based upon a written schedule. (Powers Dep. at 9). Mr. Powers stated that the reason for the frequent change in work station was a security measure to "protect against malfeasance." (*Id.*)

Mr. Powers testified about the layout of the Western Lights DMV office. (Powers Dep. at 10-13). He stated that there is a public waiting room, but the areas behind the

---

[17] (Pl.'s Ex. B) (Dkt. No. 37-4).

[18] (Pl.'s Ex. C) (Dkt. No. 37-5).

[19] (Pl.'s Ex. D) (Dkt. No. 37-6).

[20] Mr. Powers was still employed at the DMV in his position as a MVR at the time of his deposition on April 19, 2015. (Powers Dep. at 5).

counter, the employee restrooms, employee break room, and the stock room are secure locations to which a customer of the DMV would not have access. (Powers Dep. at 10-11). In addition, the stockroom is locked, so that an employee who needs to get into the stockroom must request a key from a supervisor. (Powers Dep. at 12). Mr. Powers testified that the DMV provided yearly training to instruct employees about sexual harassment and to discuss the written policy.[21] (Powers Dep. at 14). Employees are also given lockers, where they must keep their personal belongings, including their cellular telephones. (Powers Dep. at 15). Mr. Powers testified that it would be "against policy" for employees to have their telephone while they are working or at their work stations. (*Id.*) Mr. Powers also testified that employees are not allowed to take pictures of anyone while they are in the office. (*Id.*) There were several signs up around the office, which also prohibited customers from taking pictures while at the DMV. (*Id.*)

Mr. Powers testified to his understanding of the DMV policy prohibiting discrimination based upon "sex or race or color or creed or religion." (Powers Dep. at 16). He also stated that the DMV policy provides that it is not appropriate to make sexual comments in the workplace. (*Id.*) Mr. Powers also stated that, in the five years that he worked for the DMV, he never heard any sexual comments regarding customers, and did not recall making any sexual comments about customers himself. (Powers Dep. at 17). Mr. Powers also testified that he did not recall plaintiff making any sexual comments. (*Id.*)

---

[21] Mr. Powers stated that the first few years that he worked for the DMV, the training would be done "live" by an individual, but more recently the training was done by computer. (Powers Dep. at 14).

Mr. Powers was shown the photograph that plaintiff took of him in the stockroom without his shirt. (*Id.*) Mr. Powers recognized the photograph and stated that he recognized the other individual as Mr. Lance. (*Id.*) Mr. Powers stated that he and Mr. Lance were putting stock away in the stockroom. (Powers Dep. at 18). Mr. Lance had his dress shirt off, and Mr. Powers was bare-chested. (*Id.*) Mr. Powers stated that, although he was not aware of a particular dress code that required someone to remain "clothed" at the DMV, it would be permissible in that "instance" to be bare-chested. (*Id.*)

Mr. Powers was also shown the bowling photograph, and he stated that he did not know who took the picture. (Powers Dep. at 18-19). He did not know that the picture was being taken. (Powers Dep. at 21). Mr. Powers stated that the first time he saw the photograph was when he went to work the next day and discovered that Tony Kurowski sent the photograph by text to everyone in the office, including the supervisors. (Powers Dep. at 19-20). Mr. Powers stated that the only disciplinary action that was taken against him was a "counseling memo" which was placed in his personnel file. (Powers Dep. at 20). However, no one was required to attend additional training as a result of the incident. (Powers Dep. at 21). Mr. Powers spoke with Mr. Kurowski about the photograph, and told him how upset he was about the incident, but never spoke with plaintiff about the photo. (Powers Dep. at 20, 21, 25).

Mr. Powers testified that he was aware that plaintiff complained[22] to Ms. Adair

---

[22] Mr. Powers stated that plaintiff believed that the incident was "inappropriate," and she formed her own conclusions about what happened even though she was not present. (Powers Dep. at 22). He also stated that neither of the individuals who were responsible for the incident "entered into

and wanted Mr. Powers to be disciplined, even though he did not take the picture, nor did he distribute it. (Powers Dep. at 22). Mr. Powers testified that he was called into the office of the District Director, Kristen Lester-Hernandez, who has a rank above the Office Manager, and who came in from Rochester. (Powers Dep. at 23). Mr. Powers stated that he explained how embarrassed he was, and that he was not aware that the picture had been taken or that it was distributed to anyone with whom he worked. (*Id.*) He stated that, if he had know the picture was taken, he would have made sure it was not sent around. (*Id.*)

Ms. Adair testified that, as the Office Manager, she was responsible for scheduling the training for the DMV sexual harassment policy which would be done by another individual. (Adair Dep. at 9). Ms. Adair also testified that if anyone made a complaint of sexual harassment, her duty was to discuss the matter with the employees involved, and then report it to her supervisor, but Ms. Adair had no authority to discipline anyone. (Adair Dep. at 9-10). Ms. Adair testified that plaintiff never complained about "sexual harassment," she complained that employees were making "inappropriate comments." (Adair Dep. at 11). The specific inappropriate comments were that a customer was "cute" and that another customer was "hot." (Adair Dep. at 11-12). In response to plaintiff's complaint, Ms. Adair spoke with Mr. Powers and Mr. Lance, who denied the comments. She also spoke with other employees who were around them, and determined that plaintiff was the only one who heard the comments. (Adair Dep. at 13). She reported the situation to her supervisors. However, no

_____

any part of these proceedings." (*Id.*)

discipline resulted from this complaint. (Adair Dep. at 14).

When Ms. Adair was shown the photograph of Mr. Powers in the stock room, she stated that she did not know whether it was a violation of the "sexual harassment code," but that Mr. Powers was definitely inappropriately dressed. (Adair Dep. at 14-15). Ms. Adair was also shown the bowling photograph, and testified that plaintiff also complained about that photo, but that she was the only one who complained about it. (Adair Dep. at 16-17). Ms. Adair stated that plaintiff told her the photograph was offensive, and Ms. Adair reported the incident to her supervisor. (Adair Dep. at 17). Ms. Adair stated that the personnel who were involved were interviewed, but that any disciplinary action would have been taken by "Labor Relations." (*Id.*) Finally, Ms. Adair stated that after plaintiff's complaint about the bowling photograph, Ms. Adair never received any complaints about plaintiff's treatment from plaintiff or from any one else on the DMV staff. (Adair Dep. at 18).

Mr. Delmarter began working at the DMV as a cashier, and then was promoted to supervisor. He testified that he has always been assigned to the Western Lights Office. (Delmarter Dep. at 6). He supervises approximately twenty employees, making sure the money is collected, the cashiers are safe and honest, and passing out stock that is needed. (Delmarter Dep. at 7). Two supervisors work each day. (*Id.*) Mr. Delmarter testified that he knew the plaintiff from high school. (Delmarter Dep. at 9). He stated that he could not recall plaintiff ever complaining to him about sexually related comments being made by other employees in the office. (Delmarter Dep. at 9-10). He testified that the first time he heard that plaintiff was uncomfortable because of sexual

comments being made was when he got a letter in conjunction with the Human Rights investigation of plaintiff's complaint to NYSDHR. (Delmarter Dep. at 10-11).

Mr. Delmarter stated that he testified at the NYSDHR hearing "approximately two years ago." (Delmarter Dep. at 12). He also stated that he was not disciplined as a result of the hearing, and no action was taken against plaintiff. He was also not aware of any "difference in treatment" because of her complaint, and that Mr. Delmarter did not even remember plaintiff working after the hearing. (Delmarter Dep. at 13). Although Mr. Delmarter acknowledged that the staff took sexual harassment training after the NYSDHR hearing, he was not aware that plaintiff's complaint was the specific reason. (Delmarter Dep. at 14).

Mr. Delmarter was shown the stockroom picture and recognized Mr. Powers. (Delmarter Dep. at 15). Mr. Delmarter stated that he "honestly" did not know whether being bare-chested was a violation of any dress code. (*Id.*) Mr. Delmarter stated that the first time he may have seen[23] the stockroom picture was also at the NYSDHR hearing because "they were showing it" at the table. (Delmarter Dep. at 16). Mr. Delmarter knew about the bowling picture because he was at the event, and he took the picture. (Delmarter Dep. at 17). However, Mr. Kurowski was the individual who distributed the photograph to the other employees without Mr. Delmarter's knowledge. (*Id.*) Mr. Delmarter testified that Mr. Kurowski took a picture with his cellular telephone of the screen of the camera with which Mr. Delmarter took the photograph.

---

[23] He testified that he was not sure he saw the photograph because the table was long, but he did hear about the photo as it was being shown to other people at the table. (Delmarter Dep. at 16). He was not sure if it "came by" him. (*Id.*)

(*Id.*)

Mr. Delmarter discovered that the photograph had been distributed to other employees when he was called into Ms. Adair's office to speak with her and the District Director, Ms. Lester-Hernandez. (Delmarter Dep. at 18). They informed Mr. Delmarter that what he had done was not appropriate. Mr. Delmarter stated that he thought that he was disciplined, but could not remember what the discipline was. (Delmarter Dep. at 18-19). Mr. Delmarter did not think that Mr. Kurowski was ever disciplined for the incident, even though it was brought to a supervisor's attention that Mr. Kurowski actually distributed the photograph. (Delmarter Dep. at 19). Mr. Delmarter did not discipline Mr. Kurowski because he "felt that it was above me already." (*Id.*)

Mr. Delmarter testified that he did not recall ever making statements to other employees about plaintiff bringing sexual harassment charges, and he never told anyone to stop speaking to plaintiff because she made those charges. (Delmarter Dep. at 20-21). Mr. Delmarter continued to supervise plaintiff in the same way that she was always supervised, and plaintiff's duties did not change. (Delmarter Dep. at 21). Mr. Delmarter testified that he had sexual harassment training when he was an MVR, and then he was given "supervisor training on how to supervise." (Delmarter Dep. at 22). Although Mr. Delmarter testified that some cashiers made "comments" about customers, he did not remember that any of those comments were of a sexual nature. (Delmarter Dep. at 23-24).

## II.   **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material

fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citations omitted). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Courts must be cautious when granting summary judgment in a discrimination case where the merits turn on an employer's intent. *Tolbert*, 790 F.3d at 434 (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). However, it is also clear that

"'the salutary purposes of summary judgment – avoiding protracted and harassing trials-apply no less to discrimination cases than to . . . other areas of litigation.'" *Id.* (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)).

## III.   Statute of Limitations

### A.   Legal Standard

A plaintiff who seeks to pursue claims under Title VII must file administrative charges with the Equal Employment Opportunity Commission ("EEOC") or the relevant state or local agency, within 300 days after the alleged unlawful employment practice. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 78-79 (2d Cir. 2015) (citing 42 U.S.C. § 2000e-5(e)(1)); *Betterson v. HSBC Bank, USA*, No. 1:11-CV-615, 2015 WL 6157594, at *8 (W.D.N.Y. Sept. 30, 2015) (citing inter alia *Flaherty v. Metromail Corp.*, 235 F.3d 133, 136 n.1 (2d Cir. 2000)).  An unlawful employment practice for purposes of the statute can be a discrete event, such as termination of employment, or it may, as in this case, involve a claim of hostile work environment. *National R.R. Passenger Corp. v. Morgan ("Morgan")*, 536 U.S. 101, 110-19 (2002) (comparing discrete acts of discrimination with hostile work environment claims for purposes of the statute of limitations).

The Supreme Court refused to apply the "continuing violation" doctrine to discrete acts of discrimination, even if those acts were "serial," and even though the last act in the series occurred within the 300 day statute of limitations. *Id.* at 114-15. "'Multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'"

*Maioriello v. New York State Office for People with Developmental Disabilities*, No. 1:14-CV-214, 2015 WL 5749879, at *10 (N.D.N.Y. Sept. 30, 2015) (quoting *Quinn v. Green Tree Credit, Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) (additional citation omitted)). This is true even if the discrete[24] discriminatory acts are related to the acts alleged in the timely filed charges. *Id.* (citing *Morgan*, 536 U.S. at 113). However, if the claims are "tied to discrete acts in an ongoing adverse employment action that occurred within the statute of limitations period, [they] are not time barred." *Vega*, 801 F.3d at 79.

Hostile work environment claims are different from claims based upon discrete acts in that "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. The "unlawful employment practice" does not occur on a particular day, but rather over a series of days, weeks, or even years. *Id.* Hostile environment claims are based on the "cumulative effect of individual acts." *Id.* The series of separate acts then "collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing 42 U.S.C. § 2000e-5(e)(1)). The plaintiff is only required to file the charge within a certain number of days after the "unlawful practice" occurred, even if some of the components of the hostile work environment fell outside the statutory time period. *Id.* If one act contributing to the claim occurs within the filing period, the entire period of the allegedly hostile environment may be considered by the court. *Id.* However, the acts occurring outside the limitations period must be sufficiently similar to those within the

---

[24] Other examples of discrete acts are failure to promote, denial of transfer, and refusal to hire. *Morgan*, 536 U.S. at 114.

relevant time period that the events can be said to constitute the "same" hostile work environment. *Thomson v. Odyssey House*, No. at *10 (E.D.N.Y. Sept. 21, 2015) (citing inter alia *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014)). *See also McGullam v. Cedar Graphics*, 609 F.3d 70, 75-76 (2d Cir. 2010) (distinguishing between allegations of discrete acts and hostile work environment claims).

## B. Application

All parties agree that plaintiff filed her NYSDHR complaint on October 16, 2012, and that 300 days prior to that date was December 21, 2011. If plaintiff were basing her discrimination claim on discrete acts, then any acts occurring prior to December 21, 2011 would be time barred. The court notes that most of the alleged discriminatory acts occurred prior to December 21, 2011, including both of the photograph incidents and most of the allegedly "sexually-charged" statements for which plaintiff could identify specific times. However, plaintiff is basing her discrimination claim on a hostile work environment. As stated above, such a claim by its very nature, "involves repeated conduct." *Morgan*, 536 U.S. at 115.

In her response to the motion for summary judgment, plaintiff makes this argument, but then cites only conduct that occurred prior to December 21, 2011. (Pl.'s Br. at 8). In her complaint, plaintiff states that one of the times that she saw Mr. Powers "shirtless" was in the stock room in May of 2011, however, at her deposition, she testified that she "believed" that it was in May of 2012, but she could not remember the date. (Compl. ¶ 27; Pl.'s Dep. at 39, 41). In defendant's statement of material facts, defense counsel cites the complaint, and plaintiff's deposition, but states that he is

relying upon the 2011 date that plaintiff stated in her complaint. (Def.'s SOMF ¶ 19). Plaintiff admitted the allegations in defendant's paragraph 19. (Pl.'s SOMF at ¶ 19). The complaint states that "*Mr. Powers claimed*" that there was another incident in 2012 where he took his shirt off "as the 'temperature was a constant struggle.'"[25] (Compl. ¶¶ 51, 60-64) (emphasis added). The complaint also states that Mr. Powers "acknowledged that he took his shirt off and exposed his bare chest on the two occasions in question" – once in jest and once because it was hot in the office. (Compl. ¶¶ 63-64).

There is no indication that plaintiff saw this second incident, or that it happened in 2012, even if it did occur. If plaintiff did not see the alleged incident, the it could not be part of her hostile work environment case, and could not constitute an action which occurred during the time period which would save plaintiff's complaint from a statute of limitations bar. During plaintiff's deposition testimony, for the first time, she alleged that the second time that Mr. Powers took his shirt off was in Ms. Adair's office, and he had his chest in Ms. Adair's face. However, plaintiff did not associate any date with this alleged incident, and these facts do not appear in the complaint, in the NYSDHR decision or in any other part of the record.

Plaintiff does allege one statement made by Mr. Lance in March of 2012 that plaintiff associates with her hostile work environment claim. (Compl. ¶ 49). Plaintiff claims that Mr. Lance told plaintiff "that he thought a customer was 'hot.'" (*Id.*) All of

---

[25] The decision after the NYSDHR investigation states that "[t]here were two incidents where Mr. Powers removed his shirt in the workplace," exposing his bare chest. (Compl. Ex. A at 2). However, there are no dates associated with either alleged incident.

the other allegations relate to plaintiff's retaliation claim, which is separate from the hostile work environment claim, and is within the statute of limitations. Because plaintiff is alleging hostile work environment, and she does allege that at least one incident occurred after December 30, 2011, this court will not dismiss plaintiff's hostile work environment claim based on the statute of limitations, and the court will continue its analysis.

## IV.    **Hostile Work Environment**

### A.    **Legal Standards**

Plaintiff brings her claims under Title VII and under the NYHRL. Claims brought under both of these statutes are analyzed under the same standard. *Hyek v. Field Support Services, Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab*, 461 F.3d 134, 140-41 (2d Cir. 2006)). In order establish that plaintiff was subjected to a hostile work environment, she must show that the conduct of which she complains:

> (1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or other protected characteristic.

*Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 188 (E.D.N.Y. 2013) (quoting *Robinson v. Harvard Prot. Servs.*, 495 Fed. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted). *See Tillman v. Luray's Travel*, No. 14-CV-105,

2015 WL 5793501, at *7 (E.D.N.Y. Sept. 30, 2015) (quoting *Lucenti v. Potter*, 432 F. Supp. 2d 347, 361 (S.D.N.Y. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Conduct that is not sufficiently severe or pervasive to create an "objectively hostile or abusive environment" does not rise to the level of a hostile work environment. *Tillman*, 2015 WL 5793501 at *7 (citing *Harris*, 510 U.S. at 21).

Whether an environment is hostile or abusive must be determined by looking at all the circumstances. *Id.* (citing *Harris*, 510 U.S. at 23). In *Harris*, the Court provided some factors to be considered which may guide the determination. *Id.* These factors include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* However, it must be noted that Title VII "'does not set forth a genreal civility code for the American workplace.'" *Id.* at *8 (quoting *Burlington N. & Santa Fe Ry. Co. v. White ("White")*, 548 U.S. 63, 68 (2006)). Work environments which are unpleasant, harsh, combative or difficult do not rise to the level of a hostile work environment for purposes of the statutes. *Id.* (quoting *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 250 (W.D.N.Y. 2003)).

In addition, the conduct must be linked to plaintiff's protected class. *Tillman*, 2015 WL 5793501, at *8 (citing *Alfano v. Costello.*, 294 F.3d 365, 374 (2d Cir. 2002). In order to establish this requirement, plaintiff may provide evidence that her protected status was the cause of the abusive conduct. *Id.* (citing *Alfano*, 294 F.3d at 378). Plaintiff may also assert "facially neutral incidents," as long as "a reasonable fact-finder

could conclude that they were, in fact, based on the [protected status]." *Id.* (internal quotation marks omitted). The ultimate determination must be based only on abusive conduct which is proven to be based on plaintiff's membership in the protected class. *Id.* (citing *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010)).

Finally, plaintiff must also establish that the hostile work environment may be imputed to her employer to establish the employer's liability for hostile actions taken by its employees. *Dall*, 966 F. Supp. 2d at 189 (citing inter alia *Vance v. Ball State Univ.*, 570 U.S. __, 133 S. Ct. 2434, 2443 (2013) (discussing under what circumstances an employer may be held liable for harassment by another employee).

While generally, hostile work environment claims present mixed questions of law and fact that are "well-suited for jury determination," summary judgment may be granted when cases lack genuine issues of material fact. *Id.* (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) (summary order) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)). In order to survive a motion for summary judgment, the plaintiff must show either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted to have altered the conditions of her work environment.'" *Id.*

## B.    Application

None of the statements allegedly made by Mr. Powers and Mr. Lance created a hostile work environment for purposes of either Title VII or the NYHRL. Although plaintiff states that she suffered a "barrage" of statements, she claimed that prior to

2010, the comments were infrequent.[26]  Although she stated that they got worse after 2011, she still could only remember a few instances in which she heard Mr. Powers or Mr. Lance make comments about the physical attributes of DMV customers.  The fact that these comments may have made plaintiff "uncomfortable," does not create an abusive or hostile work environment. *See Dall*, 966 F. Supp. 2d at 190 (male plaintiff alleged that female co-workers spoke frequently about their sex lives and showed explicit photographs in the workplace).  Even assuming that Mr. Powers or Mr. Lance would "flirt" with customers, this alleged conduct had nothing to do with the plaintiff or more importantly, the fact that plaintiff was a woman.  The fact that plaintiff may have found the alleged "flirting" or comments offensive or unprofessional does not convert the inappropriate behavior into a hostile work environment for her.

In *Dall*, the court granted summary judgment on the hostile work environment claim.  The facts in *Dall* are very similar to this case.  The court held that the conduct of Dall' co-workers was directed at both men and women, and that "'a lot of people'" found the conduct "offensive." *Id.*  Notwithstanding Dall's evidence showing that another nurse stated that the alleged actions made the work environment "uncomfortable,"[27] the court stated that "'[o]bscene language or gestures' and 'the occasional vulgar banter, tinged with sexual innuendo, or coarse or boorish workers' do not amount to a hostile work environment." *Id.* (quoting *Redd v. New York Div. of*

---

[26] At her deposition, plaintiff stated that prior to 2010 the comments were not made "on a regular basis." (Pl.'s Dep. at 19).

[27] In this case, we have the testimony of, and the letter written by, AnnMarie Clarke, stating that Lance's and Powers's conduct was inappropriate and offensive.

*Parole*, 677 F.3d 166, 177 (2d Cir. 2012)). Dall did not allege that his co-workers'
comments were directed to, or personally insulting to him, or to males in particular, nor
did he demonstrate that the comments were "obviously intended to intimidate, ridicule,
or demean him *on account of his gender or any other protected characteristic.*" *Id.*
(emphasis added). The court in *Dall* added that "[p]laintiff's contention that the
radiology department was a sexually-charged and inappropriate workplace for all
employees, both male and female, is simply not actionable." *Id.* at 190-91 (citing inter
alia *Jerram v. Cornwall Cent. Sch. Dist.*, 464 F. App'x 13, 15 (2d Cir. 2012) (summary
judgment affirmed for defendant on a hostile work environment claim where both men
and women found the offender abrasive and disrespectful, and the offender subjected
others to similar behavior)).

For the first time at her deposition, plaintiff alleged that on a "few occasions,"
Lance and Powers would comment on *her* "upper physique," but then she stated that
their comments were "mostly toward customers." (Pl.'s Dep. at 19). Plaintiff did not
even recall specifically what they may have said to her, and she testified that her
reaction was to "just walk away." (Pl.'s Dep. at 20). Plaintiff also testified that on
several occasions, she told the two men to be "a little bit more professional" and not to
make those comments. (Pl.'s Dep. at 26). Plaintiff has not asserted any conduct that
could reasonably be perceived as severe.

Plaintiff has also failed to connect Powers's and Lance's behavior to plaintiff's
gender. As stated above, she must show that she was singled out for mistreatment
because she is a woman. *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 519

(S.D.N.Y. 2010) (granting summary judgment on a hostile work environment claim where plaintiff failed to demonstrate that he was singled out because he was a man). In this case, plaintiff has failed to causally relate the alleged conduct to the fact that she is a woman. Plaintiff testified that the "derogatory" comments were "[u]sually whispered within the wedge so the employees could hear them but not the customers," but "[s]ometimes directly to customers." (Pl.'s Dep. at 25). Plaintiff also testified that "[t]hey would try to include as many employees as they could." Thus, it is clear from plaintiff's own testimony that, while Lance and Powers may have been making inappropriate comments about customers, they were not "singling out" plaintiff because she was a woman. Rather they were making comments so that all the employees would hear.

With respect to the "nudity," two or three instances is hardly "unwanted nudity on a regular basis." Neither of the specific instances of "nudity" were directed at plaintiff, nor was she "exposed" to this nudity because she was a woman. In fact, plaintiff coincidentally saw Mr. Powers without his shirt on through an open door when she happened to be going outside for a cigarette. Mr. Powers did not take off his shirt for plaintiff, he did not realize that plaintiff saw him, and he did not know that she took a photograph of him. This can hardly be viewed as "subjecting" plaintiff to nudity because she is a woman, or viewed as "subjecting" plaintiff to nudity at all. Although plaintiff alleges that there was one other time that Mr. Powers took his shirt off, she could not remember when it happened. Her testimony about Mr. Powers putting his chest in Ms. Adair's face in her office does not appear to have been raised in any other

proceeding, and in any event, the incident was not directed at plaintiff, even if it did occur.[28]

The incident in which Mr. Powers was photographed at the bowling alley with his pants down also does not contribute to establishing a hostile work environment. Plaintiff was not present at the bowling alley, and the photograph was admittedly texted to all the employees without regard to their gender. Plaintiff cannot allege that she was singled out for mistreatment because of her sex based on a photograph that was sent to all employees. Plaintiff has also failed to show that any of the comments or conduct unreasonably interfered with an her work performance. Thus, plaintiff has failed to establish that she was subjected to a hostile work environment within the meaning of either the federal or the New York statutes, and this claim may be dismissed.

## V. **Retaliation**

### A. **Legal Standards**

Claims of retaliation for engaging in protected conduct under title VII and under the HRL are analyzed under the three-step, burden-shifting test, articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Dall*, 966 F. Supp. 167,

---

[28] Defendants cite *Adams v. City of New York*, 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011) for the proposition that a "shirtless" supervisor, working with his pants unzipped, was not severe enough to establish a hostile working environment. (Def's Br. at 12-13). *Adams* was brought under the New York *City* Human Rights Law ("NYCHRL"), which is analyzed under more lenient standard than Title VII or the NYSHRL. A plaintiff's claims under the NYCHRL must receive "an independent liberal construction" that is not "co-extensive" with federal counterparts. *Id.* (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)). Even pursuant to this more lenient standard, the court held that a "reasonable jury would not find that the conduct of her shirtless male supervisor, though 'boorish and offensive,' was so grave that it would alter the conditions of [plaintiff's] employment." *Id.*

191-92 & n.12 (citation omitted).  Pursuant to *McDonnell Douglas*, plaintiff must first establish a prima facie case of retaliation. *Id.*  If plaintiff succeeds in doing so, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the action that plaintiff alleges was retaliatory. *Id.* (citing inter alia *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)).  If the employer is successful at the second step, the plaintiff must establish that but for the protected activity employer would not have taken the adverse action against the plaintiff. *Id.* (citing *Univ. of Texas Southwestern Medical Ctr. v. Nassar*, 570 U.S. __, 133 S. Ct. 2517, 2534 (2013)).

In order for the plaintiff to establish a prima facie case of retaliation, she must establish (1) that she participated in an activity protected by the discrimination statutes; (2) that the defendant was aware of that activity; (3) that the employer took an adverse employment action against the plaintiff; and (4) that there is a causal connection between the alleged adverse action and the protected activity. *Id.* at 192 (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs*, 716 F.3d 10, 14 (2d Cir. 2013) (other citations omitted)).  The plaintiff's burden at the summary judgment stage is "minimal" and "de minimis," and the court must determine only whether the "'proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

It has been held that a broader scope of actions may qualify as "adverse employment actions" than those prohibited by Title VII's anti-discrimination

provisions, and an employee may not be limited to only those actions that materially affect the terms and conditions of her employment. *Bacchus v. New York City Dep't of Educ.*, __ F. Supp. 3d __, 2015 WL 5774550, at *20 (E.D.N.Y. Sept. 30, 2015) (citing *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 325 (E.D.N.Y. 2014) (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks v. Baines*, 593 F.3d at 165 (quoting *White*, 548 U.S. at 57).

The court in *Hicks* analyzed the retaliation standard extensively, explaining the Supreme Court's decision in *White*. *Id.* at 164-65. Because "material adversity" is required, the Court in *White* preserved the principle that Title VII does not set forth a general civility code for the American workplace, protecting an individual only from retaliation that produces an injury or harm. *Id.* at 165 (quoting *White*, 548 U.S. at 67, 68). By considering the perspective of a "reasonable employee," the Court established an objective standard. *Id.* Actions that are "trivial harms," petty slights, and minor annoyances that often take place at work and that all employees may experience, do not rise to the level of "materially adverse" actions. *Id. See also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (citing *White*, 548 U.S. at 67-68). However, context matters, and alleged acts of retaliation must be evaluated separately and in the aggregate because even trivial acts may take on greater significance when viewed as part of a larger course of conduct. *Tepperwien*, 663 F.3d at 568 (citing *Hicks v. Baines*, 593 F.3d at 165).

## B.    Application

Defendant argues that plaintiff has failed to establish a prima facie case of retaliation. (Def.'s Br. at 16-18).  Plaintiff made verbal complaints to her supervisors, to her union, and ultimately filed a complaint with NYSDHR.  There is no question that plaintiff's activity is protected by the relevant statutes.  It is clear that Title VII and the HRL protect activity which opposes discrimination prohibited by statute. *Id.* (citing *Jute*, 420 F.3d at 173).  In addition, it is not necessary that the conduct was "actually prohibited by Title VII, but only that the plaintiff had a 'good faith belief; that such conduct was prohibited.'" *Id.* at 193 (quoting *LaGrande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010)).  The fact that this court has found the plaintiff's hostile work environment claim to be lacking merit is not dispositive of a retaliation claim, as long as the plaintiff had a good faith belief that she was opposing prohibited action. *Id.*  It is also clear that plaintiff's employer had knowledge of the protected activity.  Thus, plaintiff has satisfied two prongs of the retaliation analysis.

However, plaintiff has failed to establish the last two factors of the analysis. Plaintiff has failed to show that any adverse action was taken against her, or that any action taken by defendant was causally related to plaintiff's protected activity.  In her complaint, plaintiff alleges that Mr. Delmarter was "part of the retaliation" that followed plaintiff reporting the incident in which Mr. Powers's buttocks were exposed in the bowling photograph. (Compl. ¶ 66).  Plaintiff claims that after her "report,"[29] Mr.

---

[29] The court assumes that plaintiff means her verbal complaint regarding the photograph, because plaintiff testified at her deposition that Mr. Delmarter was "making it a very hostile work environment . . . prior to any formal complaint being filed." (Pl.'s Dep. at 48).  She later testified that

Delmarter would tell staff to "watch out" for plaintiff because she was trying to "press sexual harassment charges against them." (Compl. ¶ 68). Plaintiff also claimed that Mr. Delmarter refused to speak with plaintiff, and Mr. Powers and Mr. Lance became "standoffish." (Compl. ¶ 69). Plaintiff's union representative allegedly told plaintiff that Mr. Delmarter told the union representative that "they" would "write plaintiff up for saying hi to Mr. Delmarter if plaintiff filed charges against "them" with the union. (Compl. ¶ 71). Plaintiff alleged that this statement "may suggest" that the defendant engages in a pattern of retaliation when an employee exercises her right to report inappropriate or discriminatory behavior.[30] (Compl. ¶ 73). However, plaintiff was never "written up" for anything during the time that she was working at Western Lights, and she testified that she always received excellent evaluations. (Pl.'s Dep. at 61).

During her deposition, plaintiff testified that Mr. Delmarter also shared embarrassing facts about plaintiff's youth with other employees, although plaintiff did not know specifically to whom Mr. Delmarter related these facts. (Pl.'s Dep. at 51-52). It is unclear how plaintiff knew that Mr. Delmarter told anyone about this incident. Plaintiff testified that he mentioned the incident to her, but that she did not think anyone else heard him. (Pl.'s Dep. at 53). Plaintiff claims that on September 11, 2012 –

Mr. Delmarter's "retaliation" was all prior to the NYSDHR complaint being filed. (Pl.'s Dep. at 72).

[30] This statement appears to have been taken from the NYSDHR decision finding probable cause in this case. (Compl. Ex. A at 2). A review of the decision shows that the statement was hearsay before the state agency as well. (*Id.*) It does not appear that plaintiff was present when Mr. Delamater allegedly "told" this to the union representative. Mr. Delamater denies making such a statement, and as stated above, plaintiff was never "written up" for anything at anytime before she transferred to North Syracuse.

34

prior to plaintiff's NYSDHR complaint, but after her verbal complaints – Ms. Adair told Mr. Lance to get his dog out of the office because "we already have enough bitches."[31] (Pl.'s Dep. at 56). Plaintiff assumed that she was referring to plaintiff because Ms. Adair looked at plaintiff when she made the comment to Mr. Lance. (*Id.* at 56-57).

Plaintiff testified that after she filed the complaint with NYSDHR, the "retaliation was immense," but then she described it as "very subtle." (Pl's Dep. at 71, 73). In addition, plaintiff's description of "immense," but "subtle" retaliation was having to sit next to two co-workers who were "difficult" to work with, more often that she would have otherwise. (Pl.'s Dep. at 72-76). Plaintiff also testified that other co-workers told her to "watch [her] back." (*Id.* at 75-76). However, plaintiff was not terminated, demoted, nor was she ever subject to poor work evaluations.[32] In fact, she testified that she never received a negative evaluation the entire time that she worked at the DMV. (Pl.'s Dep. at 61). Plaintiff testified that the only "complaints" that she received about her performance were that another employee complained that plaintiff

---

[31] Ms. Adair was actually referring to a real dog, which Mr. Lance brought to the office. (Pl.'s Dep. at 57).

[32] Discharge, demotion, material loss of benefits, material alteration of job status, and/or constructive discharge are considered "materially adverse" actions. Plaintiff was not subjected to any of those employment actions. However, as stated above, an adverse employment action is not defined solely in terms of job termination and reduced benefits, and that "less flagrant" reprisals may be considered adverse. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997). In *Wanamaker*, the court noted that at least one court held that the denial of an office and a telephone "combined" to contribute to an atmosphere of adverse employment action, but the loss was "accompanied by a loss of status, a clouding of job responsibilities, and a diminution in authority." *Id.* (citing *Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir. 1987) (employer may make job undesirable without affecting money or benefits)).

was doing "too good of a job," that plaintiff was not going to be "rewarded for as well as [she] did," and that it "just made the rest of them look bad." (*Id.* at 63).

This court finds that no reasonable juror could find that any of the actions alleged by plaintiff, whether alone or in the aggregate, were "materially adverse." The fact that the two individuals who plaintiff alleged were acting inappropriately became "standoffish" after she complained verbally is not materially adverse. No reasonable juror could find that being exposed to a "standoffish" individual would prevent someone from filing a discrimination complaint, and no reasonable employee would be dissuaded from filing a discrimination complaint based on such behavior.

Being assigned a work station next to an individual who plaintiff believed to be difficult could not be considered a "materially adverse" action under the statute. Office reassignments, by themselves, are not materially adverse actions under either Title VII or the HRL.[33] *See Klein v. New York Univ.*, 786 F. Supp. 2d 830, 845 (S.D.N.Y. 2011). Plaintiff testified that the work stations were randomly assigned, and even without the "retaliation," plaintiff would have to work in close proximity to these individuals "once every other week," but after plaintiff's NYSDHR complaint, she claimed that she was assigned to sit next to these difficult individuals "a minimum of three times a week." (Pl.'s Dep. at 74).

---

[33] There are cases, holding that job or schedule reassignments may be material, depending on the circumstances, such as changing the schedule of a "young mother with school age children." *Hicks*, 593 F.3d at 165 (quoting *White*, 548 U.S. at 69). Presumably, such a schedule change could make it very difficult for the individual to care for her children. This case in not one of those cases in which the office reassignment would be harmful to the plaintiff within the meaning of the statute or be considered adverse.

Plaintiff testified that these workstation assignments were made to "push her buttons" and to see "what they could make happen." (Pl.'s Dep. at 73). However, plaintiff did not testify that anything happened, merely that she was assigned to sit next to allegedly difficult employees. With respect to one such employee, plaintiff alleged that no one liked sitting next to her because she was "prone to outbursts" and "yelled" at co-workers and employees, but plaintiff did not allege that she "yelled" at her or caused any other trouble for her. (Pl.'s Dep. at 75). The other employee that plaintiff apparently did not like to be near was Tony Kurowski. (Pl.'s Dep. at 76). Earlier, however, plaintiff testified that she had given Mr. Kurowski her telephone number, and they sent texts to each other on various occasions. In fact, when plaintiff confronted Mr. Kurowski after he sent the bowling photograph of Mr. Powers, Mr. Kurowski apologized to her and told her that he would not do that again.

While, if true, Mr. Delmarter's conduct in relating embarrassing personal information about plaintiff would be inappropriate, as stated above, plaintiff did not even know to whom this information was allegedly told. While "unchecked" retaliatory co-worker[34] harassment, if sufficiently severe may be "materially adverse," gossip, and even empty verbal threats have been found insufficient. *Nunez v. New York State Dep't of Corrections and Community Supervision*, No. 14-CV-6647, 2015 WL 4605684, at *13 (S.D.N.Y. July 31, 2015) (citing *Rivera v. Rochester Genesee Regional Transport. Auth.*, 743 F.3d 11, 26 (2d Cir. 2012)). Negative or otherwise insulting statements "are

---

[34] Although Mr. Delmarter was "superior" in rank to plaintiff, he was outside the "chain of command," and he was not her "supervisor." (Pl.'s Dep. at 50-51).

hardly even actions, let alone 'adverse actions.'" *Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, 280 (S.D.N.Y. 2004) (citing *Brennan v. City of White Plains*, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999) ("While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior without more, hardly rises to the level of actionable retaliation.")). The same is true for Ms. Adair's alleged "comment." In addition, Ms. Adair's statement to Mr. Lance is not actionable. Plaintiff only assumed the Ms. Adair's comment about having too many "bitches" was directed at her because Ms. Adair was "looking" at plaintiff when she said it, even though she was speaking to Mr. Lance.

Plaintiff requested the transfer to another office of the DMV, and she received the requested transfer, albeit not as quickly as she wanted. Thus, plaintiff's transfer was no adverse, nor was it causally related to her protected activity. Plaintiff testified that she requested the transfer in October of 2012, and she was transferred to the North Syracuse office in January of 2013, after plaintiff's doctor wrote her a note. Ultimately, plaintiff left the DMV voluntarily after she received a disciplinary "notice" for using foul language. This happened in the beginning of 2014, long after she left Western Lights. (Pl.'s Dep. at 8-11, 77). Other than the 2014 Notice of Discipline, plaintiff never received any written counseling while employed by the DMV. (Pl.'s Dep. at 11). The disciplinary notice resulted in a settlement whereby plaintiff lost five vacation days, but no further action was taken.

The court notes that plaintiff testified that she lost "overtime," and she had a longer commute to work when she "had" to transfer to North Syracuse. First, plaintiff

38

asked for the transfer to North Syracuse, and she did not "lose" pay. She transferred to the same position she held at the Syracuse office. She testified that she had to "leave for a lengthy amount of time due to illness," and so she lost overtime that she "would have been able to have." (Pl.'s Dep. at 63). She did not lose overtime as a result of her requested transfer. Although she stated that she attributed this illness to the conduct she suffered at the DMV, she stated that she transferred to North Syracuse in January of 2013, but she did not "leave" due to illness until "toward the end of 2013." (Pl.'s Dep. at 66).

For the first time in her response to the motion for summary judgment, plaintiff relies upon a hearsay statement by AnnMarie Clarke, claiming that defendant would retaliate against "troublemakers" by denying them time off. (Pl.'s Br. at 11). Ms. Clarke claimed that if a trouble maker asked for time off, a more senior individual would come along and ask for the same time off, allowing defendant to deny the "troublemaker's" request. Plaintiff has never alleged such a form of retaliation, either in her complaint or during her deposition. Ms. Clarke never mentioned a specific person or a specific incident. Such an allegation cannot be considered a adverse action since plaintiff has never alleged that she was subject to such an action.

In this case, whatever "loss" plaintiff alleges was not associated with a "materially adverse" action by the defendant. Plaintiff's allegations all fall within the "petty slights" or "minor annoyances" that do not rise to the level of materially adverse action, and no reasonable person in plaintiff's position would find otherwise. Thus, plaintiff's retaliation claims may be dismissed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that defendant's motion for summary judgment (Dkt. No. 33) is

**GRANTED**, and the complaint is **DISMISSED IN ITS ENTIRETY**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT.**

Dated: November 9, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge